Case No. 13-71163

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

NORDSTROM, INC.,

Petitioner,

v.

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA,

Respondent,

GINA BALASANYAN,

Real Party in Interest.

**On Appeal from D.C. No. 3:11-cv-02609-JM**

## RESPONSE OF JULIE A. DUNNE, LARA K. STRAUSS, AND JOSHUA D. LEVINE TO ORDER TO SHOW CAUSE

Pierre H. Bergeron
Squire Sanders (US) LLP
221 E. Fourth Street
Cincinnati, Ohio 45202-4095
Telephone: (513) 361-1200
Fax: (513) 361-1201
pierre.bergeron@squiresanders.com

Mark C. Dosker
Squire Sanders (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111
Telephone: (415) 954-0200
Fax: (415) 393-9887
mark.dosker@squiresanders.com

*Attorneys for Julie A. Dunne, Lara K. Strauss, and Joshua D. Levine*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................i

TABLE OF AUTHORITIES .......................................................... iii

INTRODUCTION ........................................................................1

STATEMENT OF THE CASE AND FACTS ....................................2

    A.    Factual Background ....................................................2

    B.    Counsel Took Reasonable Steps Prior to Filing the
Petition ...................................................................3

    C.    The Petition Was Filed In The Context Of A Broader
Litigation Environment Involving Minimum Wages
Issues .....................................................................5

    D.    Background On The Affected Attorneys ...................................9

    E.    The Ninth Circuit Enters Its June 27, 2013 Order
Denying The Petition .................................................10

ARGUMENT .........................................................................11

  I.    Sanctions Under The Court's Inherent Authority Constitute an
Extraordinary Remedy And Cannot Be Imposed Absent Bad
Faith ...........................................................................11

  II.    Sanctions Are Not Warranted Because The Affected Attorneys
Filed The Mandamus Petition In Good Faith......................................14

    A.    There Is No Evidence That The Affected Attorneys
Acted In  Bad Faith ..................................................15

    B.    The Petition Was Filed With a Good Faith Belief That it
Presented a Colorable Claim for Mandamus .........................17

        1. This Court's Flexible Standard for Mandamus Relief.........18

        2.  The Petition Carefully Analyzed And Applied The
Governing Bauman Elements .............................................20

            a. The Petition Explained Why Immediate
Appellate Review Was Unavailable ............................20

            b. The Petition Explained Why Nordstrom Would
be Damaged in a Way Not Correctable on
Appeal......................................................................22

        c. The Petition Explained Why a Clear Error of
           Law Existed ...............................................................25

        d. The Petition Explained that it Raised a Novel
           Issue of First Impression.............................................30

        e. The Final Bauman Factor ..........................................33

      3. The Broad Amicus Support For The Petition Further
         Confirms Good Faith ..........................................................33

      4. Counsel Sought Advice From The Co-Chair Of Their
         Firm's Appellate Group Before Filing The Petition...........34

      5. Counsel Are Widely Respected Attorneys Who
         Never Have Been Sanctioned Previously ...........................35

    C. This Circuit Has Never, in any Published Order,
       Previously Declared a Mandamus Petition Frivolous and
       Issued an Order to Show Cause Why Monetary Sanctions
       Should Not Be Imposed ............................................................36

III. Monetary Sanctions Are Not Appropriate In This Case, Under
    This Court's Inherent Authority.........................................................39

    A. Monetary Sanctions Would Serve No Compensatory or
       Deterrent Purpose.....................................................................39

    B. Monetary Sanctions Would Chill Legitimate Advocacy.........41

CONCLUSION ........................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Admiral Ins. Co. v. U.S. Dist. Court*,
    881 F.2d 1486 (9th Cir. 1989) ................................................................3

*Ali v. Tolbert*,
    636 F.3d 622 (D.C. Cir. 2011) ...............................................................13

*American Express Co. v. Italian Colors Rest.*,
    133 S. Ct. 2304, 2013 U.S. LEXIS 4700 (2013) ......................................3

*Armenta v. Osmose, Inc.*,
    135 Cal. App. 4th 315 (2005) ..........................................................26, 27

*Autorama Corp. v. Stewart*,
    802 F.2d 1284 (10th Cir. 1986) .............................................................13

*Bauman v. United States Dist. Ct.*,
    557 F.2d 650 (9th Cir. 1977) .......................................................passim

*Blue v. U.S. Dep't of Army*,
    914 F.2d 525 (4th Cir. 1990) ...................................................................9

*Chambers v. Nasco, Inc.*,
    501 U.S. 32 (1991) ..........................................................................passim

*Cole v. United States Dist. Ct. for the Dist. of Idaho*,
    366 F.3d 813 (9th Cir. 2004) ..........................................................19, 20

*Conner v. Travis County*,
    209 F.3d 794 (5th Cir. 2000) .................................................................41

*Credit Suisse v. United States Dist. Ct. for the Central Dist. of Cal.*,
    130 F.3d 1342 (9th Cir. 1997) ....................................................21, 22, 3

*CytoLogix Corp. v. Ventana Med. Sys.*,
    513 F.3d 271 (1st Cir. 2008) .................................................................37

*Demos v. United States Dist. Ct.*,
    925 F.2d 1160 (9th Cir. 1991) ........................................................16, 36

*Deutsch v. Tippy*,
    1996 U.S. App. LEXIS 2501 (2d Cir. Jan. 16, 1996) .................................8

*EEOC v. Banner Health*,
    402 Fed. App'x 289 (9th Cir. 2010) ......................................................13

*Elliott v. Tilton*,
    64 F.3d 213 (5th Cir. 1995) ...................................................................12

*Estiverne v. Sak's Fifth Ave.*,
  9 F.3d 1171 (5th Cir. 1993) ...........................................32

*Fink v. Gomez*,
  239 F.3d 989 (9th Cir. 2001) ....................................12, 17

*Fitz-Gerald v. SkyWest, Inc.*,
  155 Cal. App. 4th 411 (2007) ......................................28

*Freeman v. Local Union No. 135 Chauffeurs, Teamsters*,
  746 F.2d 1316 (7th Cir. 1984) ....................................33

*Gonzalez v. Downtown LA Motors*,
  215 Cal. App. 4th 36 (2013) ................................. passim

*Green v. Occidental Petroleum Corp.*,
  541 F.2d 1335 (9th Cir. 1976) ....................................26

*Grimes v. Commissioner*,
  806 F.2d 1451 (9th Cir. 1986) ....................................42

*In re Cement Antitrust Litig.*,
  673 F.2d 1020 (9th Cir. 1982) ....................................25

*In re Keegan Management Co., Sec. Litig.*,
  78 F.3d 431 (9th Cir. 1996) ........................................12

*In re Porto*,
  645 F.3d 1294 (11th Cir. 2011) ..................................13

*In re Vincent*,
  105 F.3d 943 (4th Cir. 1997) ......................................36

*Islamic Shura Council of S. Cal. v. FBI*,
  635 F.3d 1160 (9th Cir. 2011) ....................................25

*Kipps v. Caillier*,
  197 F.3d 765 (5th Cir. 1999) ......................................41

*Klein v. Stahl GMBH & Co. v. Maschinefabrik*,
  185 F.3d 98 (3d Cir. 1999)..........................................39

*Lahiri v. Universal Music & Video Distrib. Corp.*,
  606 F.3d 1216, 2010 U.S. App. LEXIS 11504 ........................14

*Las Vegas v. Foley*,
  747 F.2d 1294 (9th Cir. 1984) ....................................24

*Liberty Mutual Ins. Co. v. Ward Trucking*,
  48 F.3d 742 (3d Cir. 1995)..........................................37

*McLee v. Chrysler Corp.*,
  38 F.3d 67 (2d Cir. 1994)............................................21

*Mercer v. Fayette Circuit Court*,
  1995 U.S. App. LEXIS 9051 (6th Cir. Apr. 13, 1995) ...............38

*Miller v. City of L.A.*,
   661 F.3d 1024 (9th Cir. 2011) ................................................................40

*Mississippi Chem. Corp. v. Swift Agricultural Chem. Corp.*,
   717 F.2d 1374 (Fed. Cir. 1983)..............................................................21

*Peabody v. Time Warner Cable, Inc.*,
   2012 Cal. LEXIS 10399 (Cal. 2012) ......................................................7

*Peabody v. Time Warner Cable, Inc.*,
   689 F.3d 1134 (9th Cir. 2012) ......................................................passim

*Peabody v. Time Warner Cable, Inc.*,
   Case No. CV 09-6485-AG (C.D. Cal.) ...................................................6

*Primus Auto. Fin. Servs. v. Batarse*,
   115 F.3d 644 (9th Cir. 1997) ...................................................12, 13,42

*Quezada v. Con-Way Freight, Inc.*,
   2012 U.S. Dist. LEXIS 98639 (N.D. Cal. 2012).......................................5

*Seedman v. United States Dist. Ct.*,
   837 F.2d 413 (9th Cir. 1988)..................................................................35

*Shepherd v. American Broadcasting Cos., Inc.*,
   62 F.3d 1469 (D.C. Cir. 1996) ...............................................................14

*Stroh Container Co. v. Delphi Indus., Inc.*,
   783 F.2d 743 (8th Cir. 1986) .................................................................37

*Thomas v. Guardsmark, LLC*,
   487 F.3d 531 (7th Cir. 2007) .................................................................37

*Topalian v. Ehrman*,
   3 F.3d 931 (5th Cir. 1993).....................................................................39

*Ty Inc. v. Softbelly's, Inc.*,
   517 F.3d 494 (7th Cir. 2008) .................................................................14

*United Nat'l Ins. Co. v. R&D Latex Corp.*,
   242 F.3d 1102 (9th Cir. 2001) ...............................................................39

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982).....................................................................13

*Wilcox v. Commissioner*,
   848 F.2d 1007 (9th Cir. 1988) ...............................................................16

*Yagman v. Republic Ins.*,
   987 F.2d 622 (9th Cir. 1993) .................................................12, 13, 17

*Zambrano v. City of Tustin*,
   885 F.2d 1473 (9th Cir. 1989) .............................................11, 12, 13

*Zarowitz v. BankAmerica Corp.*,
   866 F.2d 1164 (9th Cir. 1989) ...............................................................42

**STATUTES**

28 U.S.C. § 1292(b).................................................................20

28 U.S.C. §1651(a)................................................................41

28 U.S.C. § 1927..................................................................16

**OTHER AUTHORITIES**

Fed. R. App. P. 38 ................................................................11

9th Cir. General Order 12.9(a) ................................................43

9th Cir. Rule 46-2.................................................................43

## INTRODUCTION

The Panel determined that the petition for a writ of mandamus (the "Petition") filed by Nordstrom, Inc. ("Nordstrom") was frivolous and directed Nordstrom's attorneys to show cause why a monetary sanction should not be imposed.

Based on the Court's inherent authority (which is the standard identified by the Panel), sanctions are only available when the party or counsel acted in subjective bad faith. As set forth more fully below, counsel respectfully submit that they acted at all times in good faith and never intended to use the judicial process for any improper or unduly burdensome purpose. To the contrary, counsel filed the Petition to raise a discrete legal issue of first impression that would resolve this class action and potentially others as well, thereby broadly affecting the retail industry with regard to how employees are paid, and in the process conserving the resources of the judiciary and all impacted parties.

Counsel for Nordstrom are mindful that mandamus is an extraordinary remedy, and they did not lightly pursue the mandamus petition in this case. The reason the Petition was filed is that counsel sincerely believed that it would promote judicial economy, streamline ongoing and protracted litigation, and resolve a novel issue of law that impacts not only this pending class action, but potentially other pending class actions in California federal and state court. In other words, this case posed a very important issue, as amplified in the *amicus* filings.

Counsel have been practicing law for almost 40 years collectively, and none of them has ever been sanctioned.  Taking into consideration the totality of circumstances, they respectfully submit that the Appellate Commissioner should discharge the Order to Show Cause, and not recommend any sanctions.[1]

## STATEMENT OF THE CASE AND FACTS

### A.    Factual Background.

Nordstrom is a specialty fashion retailer that operates department stores in California and employs salespeople to sell clothing and other merchandise to customers.  (AP 217:11-17).[2]  Nordstrom paid the Balasanyan Plaintiffs an hourly rate for all "non-sell" hours worked, and commissions pursuant to a draw commission plan for all "selling time" worked.  (AP 219:24-220:18).  Nordstrom's draw commission plan guaranteed that the Balasanyan Plaintiffs would earn at least $10.85 for every hour worked, which ensured that the plaintiffs were always paid more than minimum wage for every hour they work. The draw commission plan further allowed the Balasanyan Plaintiffs to earn much higher wages through commissions.  (AP 2:18-3:2, 219:14-23, 1007-1018).

---

[1] The Affected Attorneys are filing a virtually identical response to the Court's Show Cause Order in the *Marventano* case, Appeal No. 13-71162. Although the Petitions filed in the two appeals were substantially similar, the appeals have not been consolidated by this Court.

[2] "AP" is used for all citations to the Appendix in Support of Nordstrom's Petition.

The district court ultimately denied Nordstrom's motion for summary judgment as to the Balasanyan Plaintiffs' minimum wage claims. (AP 4-15). Nordstrom subsequently moved for reconsideration and alternatively an interlocutory appeal, which the district court denied.

**B.     Counsel Took Reasonable Steps Prior to Filing the Petition.**

Julie A. Dunne, Lara K. Strauss, and Joshua D. Levine (collectively, the "Affected Attorneys") filed the mandamus petition (the "Petition") on behalf of Nordstrom to seek review of the district court's summary judgment order that broadly affects how retailers are required to structure their compensation practices for their employees. Indeed, the Affected Attorneys filed the Petition only after exhausting all other available means of potential review.

It was the Affected Attorneys' hope that such intervention would promote judicial economy, conserve the resources of the parties and the court, and avoid an unnecessary, time-consuming, and costly class action trial. As the Supreme Court recognized just last month in *American Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2013 U.S. LEXIS 4700 (2013), class action mechanisms are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Id.* at *9. Accordingly, given that the class action is an exceptional tool, there is justification for occasionally resorting to exceptional remedies (such as mandamus) to avoid its potentially burdensome consequences.

The Affected Attorneys also took reasonable steps prior to filing the Petition to ensure that it was properly supported.[3]  Before pursuing the Petition, for example, Ms. Dunne not only carefully considered the applicable standard for mandamus review and how the facts of the case satisfied that standard, she also contacted the co-chair of her firm's Appellate Practice Group to obtain his independent input regarding the propriety of filing the petition and the petition itself.  *See* Declaration of Julie Dunne ("Dunne Decl.") at ¶ 19.

Ms. Strauss researched and analyzed the available authority in California and relevant authority outside of California addressing the validity of draw commission pay plans at multiple stages of litigation.  *See* Declaration of Lara Strauss ("Strauss Decl.") at ¶ 8.  Ms. Strauss reviewed and analyzed the authorities addressing the standard for pursuing a mandamus writ and how Nordstrom's case fit within that authority.  *Id.*

Mr. Levine extensively researched and analyzed case law relating to mandamus petitions filed in other cases in the federal appellate courts.  *See* Declaration of Joshua Levine ("Levine Decl.") at ¶ 7.  He further researched and

---

[3] As the Appellate Commissioner is aware, colleagues of the Affected Attorneys likewise filed a contemporaneous mandamus petition, which was disclosed in the Petition.  (Pet. at 13 n.10).  It is unclear if the Panel was concerned about the multiple filings, but it certainly cannot be the case that a law firm is precluded from seeking similar relief on behalf of multiple clients in multiple cases if the attorneys reasonably believe such relief is justified.  To hold otherwise would create a host of ethical problems.

reviewed pleadings in many related cases involving the legal questions at issue in Nordstrom's case. *Id.*

Based on the research and analysis conducted by counsel, they prepared a mandamus petition that correctly cited the governing standard and advanced arguments in support of the relevant guidelines. The Petition also garnered the support of several *amici*, whose filings reinforced the arguments advanced in the Petition.

## C. The Petition Was Filed In The Context Of A Broader Litigation Environment Involving Minimum Wages Issues.

Nordstrom's Petition did not arise in isolation. Rather, several cases implicating similar (but not identical) issues are currently being litigated. *See Peabody v. Time Warner Cable, Inc.*, 689 F.3d 1134 (9th Cir. 2012); *Gonzalez v. Downtown LA Motors*, 215 Cal. App. 4th 36 (2013); *see also Quezada v. Con-Way Freight, Inc.*, 2012 U.S. Dist. LEXIS 98639 (N.D. Cal. 2012).

These cases help demonstrate the overarching importance of the issues raised in the Petition, and further support the good faith basis of the Affected Attorneys in filing the Petition. *Peabody* illustrates the point. The plaintiffs in *Peabody* argued that the employer failed to satisfy minimum wage obligations every pay period because: (1) the employer paid the salary semi-monthly and paid commissions only monthly; (2) during the first pay period, when only salary was paid, the employee alleged she had occasionally worked so many hours that the

salary failed to satisfy minimum wage; and (3) the employer could not lawfully allocate the commissions paid monthly back to the hours worked during the first pay period in order to satisfy minimum wage obligations in that pay period. *See Peabody v. Time Warner Cable, Inc.*, Case No. CV 09-6485-AG (RNBx) (C.D. Cal.) (ECF Nos. 25, 29). In response, the defendant countered that an employer may allocate commissions paid monthly back over all hours worked in the month to satisfy minimum wage obligations, and the district court agreed, granting summary judgment in the defendant's favor. *See id.*, Judgment (ECF Nos. 24, 38). The plaintiffs then appealed to this Court. *Id.* (ECF No. 40).

This Court ultimately certified the following question to the California Supreme Court: "To satisfy California's compensation requirements, whether an employer can average an employee's commission payments over certain pay periods when it is equitable and reasonable for the employer to do so." *Peabody* 689 F.3d at 1135 (9th Cir. 2012). In its certification order, this Court emphasized the "significant policy implications that will [a]ffect many employers and employees throughout California." *Id.* at 1137. In its order, this Court also stated that the issue presented in *Peabody* raised a question of first impression. Thus, this Court appreciated that the question raised important (and novel) issues with wide-reaching implications. The California Supreme Court accepted the matter for

review, and the case is now pending before it.  *See Peabody v. Time Warner Cable, Inc.*, 2012 Cal. LEXIS 10399 (Cal. 2012).

Until yesterday, the *Gonzalez* case was also before the California Supreme Court, and it involved the defendant paying the plaintiff piece-rate compensation subject to a minimum wage guarantee.  The plaintiff argued that the employer could not rely on piece-rate compensation to satisfy minimum wage obligations for time spent performing duties that were not "directly related" to making a piece (in that case, making car repairs).  Downtown LA Motors' petition for review before the California Supreme Court had no less than 16 *amicus* letters filed in support.  The broad support and interest over these issues further illustrate the good faith of the Petition in this case.

The uncertainty surrounding these decisions has caused employers to question the pay plans under attack.  As the California Chamber of Commerce explained in its *amicus* letter in *Gonzalez*: "[T]he impact of the Court of Appeal's decision is vast as many industries are now in a quandary about whether to continue paying employees on a piece-rate basis.  In fact, the ruling is so broad and ambiguous, that it even casts doubt on other incentive-based compensation methods such as task, piece and commission based payment methods."  Dunne Decl. Ex. D.

As the Petition noted, Nordstrom's draw commission pay plan is both factually and legally distinguishable from the hourly compensation plan at issue in *Armenta*, the  salary-plus-commission pay plan at issue in *Peabody*, and the piece rate pay plan at issue in *Gonzalez*.  First, while the "productive hourly compensation" at issue in *Armenta* could become diluted as employees work more "unproductive time", and while the salary and piece rate compensation at issue in *Peabody* and *Gonzalez* could become diluted as employees work additional hours, the guaranteed draw compensation at issue in the Nordstrom cases can never be diluted.  The same, hourly guaranteed draw applies to each hour worked regardless of the number of hours worked.  Second, while the hourly and piece rate compensation at issue in *Armenta* and *Gonzalez* were allegedly tied to employees performing "productive work," the hourly guaranteed draw at issue in the Nordstrom cases is not tied to employees performing "productive work." Employees receive the guaranteed draw even if they never made sales, and no time could ever be uncompensated. (Pet. at 7-8).  And while the cases differ, the basic effects of the decisions *Peabody*, *Gonzalez*, and *Nordstrom* are the same, in that they all create uncertainty for employers across the industry.  As a result of all the foregoing, the Affected Attorneys reasonably believed that the issue framed in the Petition was novel and important.

**D.    Background On The Affected Attorneys.**

The Affected Attorneys are California-licensed lawyers with distinguished careers and unblemished records.   They collectively have almost 40 years of experience as practicing attorneys in the State of California, including cases in the district court and the Ninth Circuit.  *See* Dunne Decl. ¶¶ 2; Strauss Decl. ¶ 2; Levine Decl. ¶ 2.  They have never been the subject of disciplinary proceedings, and have never been sanctioned by any court in any jurisdiction for any improper conduct, including the filing of a frivolous pleading.  *See* Dunne Decl. ¶ 8; Strauss Decl. ¶ 4; Levine Decl. ¶ 5. The Affected Attorneys have extensive experience handling class action cases such as the matter underlying the Petition.  *See* Dunne Decl. ¶¶ 10, 13; Strauss Decl. ¶ 6.

 The Affected Attorneys have significant community and bar association involvement, as well as notable *pro bono* activities.  Ms. Dunne has been very active in a number of bar associations, including serving as a former chair of the Labor and Employment Law Section of the San Diego Bar Association and speaking at a number of conferences and symposiums regarding various class actions issues. *See* Dunne Decl. ¶ 6.   On a *pro bono* basis, Ms. Dunne has represented the Children's School of La Jolla for a number of years.  *Id.* at ¶ 7.

Ms. Strauss also has devoted *pro bono* services to, among other programs, the Step Up Women's Network, a nonprofit organization dedicated to helping women

and girls to fulfill their potential through mentoring and after-school and weekend programs for under-resourced communities. *See* Strauss Decl. ¶ 3.

Mr. Levine is a member of the San Diego Veterans Bar Association and the San Diego Bar Association. *See* Levine Decl. ¶ 4. Through the Veterans Bar Association and other such organizations, Mr. Levine has assisted with various efforts to help local wounded veterans and to assist veterans in finding employment after they leave the military. *Id.* He also is a volunteer with Team Rubicon, which is a disaster response veterans' service organization. *Id.* Prior to joining Littler Mendelson, P.C., Mr. Levine served in the United States Marine Corps as the Deputy Judge Advocate for the Seventh Marine Regiment in Afghanistan. *Id.* at ¶ 3. That military unit received the Presidential Unit Citation for service during his deployment. *Id.* Mr. Levine's work in Afghanistan involved numerous efforts to help develop the Afghan legal system and significant work assisting civilian relief efforts, in addition to other responsibilities. *Id.*

## E.     The Ninth Circuit Enters Its June 27, 2013 Order Denying The Petition.

On June 27, 2013, the Panel entered an order finding the Petition to be "frivolous and wholly without merit." June 27, 2013 Order (ECF No. 6). The order provided that within 21 days, the Affected Attorneys "shall show cause in writing why monetary sanctions should not be imposed against counsel individually for filing a frivolous petition for writ of mandamus." (*Id.*). The order

to show cause was referred to the Appellate Commissioner, providing that the Appellate Commissioner "shall conduct whatever proceedings he deems appropriate and shall have authority to enter an order, including an order imposing monetary sanctions." (*Id.*).  Notably, the Panel's order did not contain any analysis explaining its ruling.

## ARGUMENT

### I. Sanctions Under The Court's Inherent Authority Constitute an Extraordinary Remedy And Cannot Be Imposed Absent Bad Faith.

In referring this matter to the Appellate Commissioner, the Panel identified the basis for potential sanctions as the Court's inherent authority.  *See* June 27, 2013 Order (ECF No. 6), at 3 (specifically citing the "inherent powers of the court" and *Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991), which is an inherent authorities case).  As a result, the Affected Attorneys respectfully demonstrate below that inherent authority sanctions are inappropriate in this case.[4]

Sanctions under this Court's inherent authority constitute "an extraordinary remedy" that must be "exercised with extreme caution."  *In re Keegan Management Co., Sec. Litig.*, 78 F.3d 431, 437 (9th Cir. 1996).  As the Supreme

---

[4] The Panel neither cited nor referenced Fed. R. App. P. 38, and for that reason the Affected Attorneys do not address that standard.  (The ensuing analysis, however, likewise demonstrates that no sanctions would be appropriate under Rule 38.).  But, if the Commissioner were to consider Rule 38 sanctions (which the Affected Attorneys contend is beyond the scope of reference), as a matter of due process, the Affected Attorneys should be afforded an opportunity to respond to any such claim.

Court recognized in *Chambers*, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. Such "restraint and discretion" is essential because "inherent powers are shielded from direct democratic controls." *Zambrano v. City of Tustin,* 885 F.2d 1473, 1478 (9th Cir. 1989) (citation omitted).

Sanctions should "be reserved for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundations." *Primus Auto. Fin. Servs. v. Batarse,* 115 F.3d 644, 649 (9th Cir. 1997) (internal quotations omitted); *see also Elliott v. Tilton,* 64 F.3d 213, 217 (5th Cir. 1995) ("[T]he threshold for the use of inherent power sanctions is high.").

To guard against misuse, "there are factual and legal prerequisites to the exercise" of this narrow power. *Zambrano,* 885 F.2d at 1478. The most important prerequisite is that inherent authority sanctions may not be imposed absent a specific finding of bad faith by the attorney or conduct tantamount to bad faith. *See Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001) (sanctions may be imposed if the court "specifically finds bad faith or conduct tantamount to bad faith"); *Yagman v. Republic Ins.,* 987 F.2d 622, 628 (9th Cir. 1993) (courts "may not invoke [inherent] powers without a 'specific finding of bad faith'") (quoting *United States v. Stoneberger,* 805 F.2d 1391, 1393 (9th Cir. 1986)); *see also In re*

*Porto*, 645 F.3d 1294, 1304 (11th Cir. 2011) (a finding of bad faith is "the key to unlocking the court's inherent power" to impose sanctions).

This Circuit "insists" upon a specific finding of bad faith "because it ensures that 'restraint is properly exercised,' and it preserves a balance between protecting the court's integrity and encouraging meritorious arguments." *Primus,* 115 F.3d at 649; *see also Zambrano,* 885 F.2d at 1478. And importantly, bad faith is judged *subjectively* – not objectively – looking to the actor's state of mind. *See, e.g., EEOC v. Banner Health,* 402 Fed. App'x 289, 292 (9th Cir. 2010) ("A finding of subjective bad faith is essential to an award of attorneys' fees under either section 1927 or a court's inherent power."). In *Yagman*, for example, this Court vacated sanctions where there was no evidence that the attorney had "acted in bad faith or intended to mislead the court." *Yagman*, 987 F.2d at 628.

Because of the importance of the bad faith finding, courts also have required "clear and convincing evidence that [the sanctioned party] committed sanctionable misconduct that is tantamount to bad faith." *Ali v. Tolbert*, 636 F.3d 622, 627 (D.C. Cir. 2011); *see, e.g.*, *Autorama Corp. v. Stewart,* 802 F.2d 1284, 1287-88 (10th Cir. 1986); *Weinberger v. Kendrick*, 698 F.2d 61, 80 (2d Cir. 1982) (there must be "clear evidence" that the challenged actions "are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes"); *but see Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d

- 13 -

1216, 1219 (court) (noting that the Ninth Circuit "has not addressed the burden of proof required for a sanctions award"). As the D.C. Circuit explained in *Shepherd v. American Broadcasting Cos., Inc.*, 62 F.3d 1469 (D.C. Cir. 1996), the "Supreme Court has recognized that awards of attorneys' fees for bad faith conduct serve the same punitive and compensatory purposes as fines imposed for civil contempt," and thus, as a result, "courts require clear and convincing evidence of misconduct before imposing attorneys' fees under their inherent power." *Id.* at 1477 (citing *Chambers*, 501 U.S. at 43-54).

Echoing the principles of restraint governing inherent authority, the heightened standard of proof has been required because "in the absence of a statute or rule, the exercise of judicial authority should be governed by traditional common law or equitable principles, such as the familiar principle that fraud must be proved by clear and convincing evidence." *Ty Inc. v. Softbelly's, Inc.,* 517 F.3d 494, 499 (7th Cir. 2008).

Measured against this standard, the Affected Attorneys respectfully submit that sanctions under the Court's inherent authority are not appropriate, for the reasons explained more fully below.

## II. Sanctions Are Not Warranted Because The Affected Attorneys Filed The Mandamus Petition In Good Faith.

This Court has never, in a published order, declared a mandamus petition frivolous and referred counsel for possible monetary sanctions. And the counsel

involved, attorneys with distinguished records and no history of any prior discipline or sanctions, had a good faith belief that the filing of the petition comported with existing law and the facts at hand.

Accordingly, the Affected Attorneys respectfully submit that there is no evidence (much less clear and convincing evidence) showing that the Affected Attorneys acted in bad faith or engaged in conduct that is tantamount to bad faith. To the contrary, the Affected Attorneys filed the Petition on behalf of Nordstrom in good faith in order to raise an issue of first impression in this Circuit. And they filed the Petition only after reviewing the relevant case law and facts to ensure that the Petition raised meritorious arguments and had a reasonable chance of succeeding. Under the totality of the circumstances, it is respectfully submitted that monetary sanctions against the Affected Attorneys are not warranted

### A.    There Is No Evidence That The Affected Attorneys Acted In Bad Faith.

The hallmarks of bad faith are not present here; nor, indeed, does any evidence even suggest bad faith. Typically, in showing bad faith, one can point to repeated abuses or persistent actions contrary to judicial warnings. *See Chambers*, 501 U.S. at 51 (noting bad faith conduct involved in "an attempt to perpetrate a fraud on the court"). Nothing of the sort occurred here.

First, the Affected Attorneys cannot be said to have abused the mandamus practice of this Court. To the best of their recollection, they have, combined, filed

only one prior mandamus petition in this Circuit in almost 40 years of collective practice. Therefore, this is not a situation where a party has filed myriad meritless petitions and needs to be sanctioned to halt such conduct. *See Demos v. United States Dist. Ct.*, 925 F.2d 1160, 1160-61 (9th Cir. 1991) (noting that *pro se* litigant was a "prolific litigant" who had filed 24 petitions that were "abusive"). Indeed, the Petition was the first time that Nordstrom sought relief from this Court on the issue presented.

Second, the Petition did not seek to raise issues on which this Court had previously ruled against Nordstrom. When a party refuses to accept the authority or rulings of this Court, and persists in raising issues that have already been rejected by this Court, the Court might well view that as bad faith. *See Wilcox v. Commissioner*, 848 F.2d 1007, 1009 (9th Cir. 1988) (ordering sanctions where the court had "previously held that all of the contentions which [appellant] raises are frivolous or wholly without merit"). But nothing of the sort occurred here.

Finally, neither the purpose nor the effect of the Petition was to cause delay in any proceedings (which likely explains why the Panel did not rely on 28 U.S.C. § 1927 in its Order). The Petition was filed, and the Court did not request a response, meaning that the other side never had to do anything in response to the Petition. The purpose of the Petition was to secure an appellate ruling on a question of law as quickly as possible to provide prompt guidance to the parties (and

employers and employees across California). The Affected Attorneys reasonably believed that this Court's adjudication of a core legal issue prior to a trial would substantially conserve judicial and party resources. Indeed, the Affected Attorneys filed the Petition with the intent of streamlining the litigation and avoiding the extraordinary expenditure of time and resources (both of the parties and the court) required to litigate a class action. Dunne Decl. ¶ 16

The Affected Attorneys respectfully submit that the record does not support a finding of subjective bad faith or conduct that is tantamount to bad faith, which is necessary in order to impose sanctions under this Court's inherent authority. *See Fink*, 239 F.3d at 994; *Yagman*, 987 F.2d at 628 (courts "may not invoke [inherent] powers without a 'specific finding of bad faith'"). As a result, the lack of bad faith is dispositive. And, as discussed more fully below, the record confirms that the Affected Attorneys all acted in good faith.

**B.    The Petition Was Filed With a Good Faith Belief That It Presented an Appropriate Claim for Mandamus.**

This Court's standard for mandamus relief is neither formulaic nor rigid. Much to the contrary, this Court has repeatedly emphasized the discretionary nature of the writ. In their Petition seeking such discretionary relief, the Affected Attorneys correctly cited this Court's controlling standard and dutifully applied its guidelines. The Affected Attorneys reasonably believed that the guidelines were supported in light of the facts and law that they cited in the Petition. The Panel did

- 17 -

not explain, in its order, how a petition that cited and applied the correct standard could be frivolous – especially when the standard is discretionary.

### 1.    This Court's Flexible Standard for Mandamus Relief.

This Circuit's flexible standard for seeking mandamus relief is a factor weighing against the imposition of sanctions against the Affected Attorneys. Nearly four decades ago, this Court provided the basic guidelines for seeking mandamus relief: (1) the party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desired; (2) the petitioner will be damaged or prejudiced in a way not correctable on appeal; (3) the district court's order is clearly erroneous as a matter of law; (4) the district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules; and (5) the district court's order raises new and important problems, or issues of law of first impression. *Bauman v. United States Dist. Ct.*, 557 F.2d 650, 654-55 (9th Cir. 1977). Even as the Court crafted this test, however, it appreciated the inherently discretionary nature of the inquiry: "Although these guidelines are helpful, they of course do not always result in bright-line distinctions. First, the guidelines often raise questions of degree[.] . . . Second, rarely if ever will a case arise where all the guidelines point in the same direction or even where each guideline is relevant or applicable." *Id.* at 655. As a result, the Court must engage in "a balancing of conflicting indicators." *Id.*

- 18 -

Subsequent case law has underscored those points.  This Court recognized that the *Bauman* factors "should not be mechanically applied;" rather, whether a writ should be granted "is determined case-by-case, weighing the factors . . . ." *Cole v. United States Dist. Ct. for the Dist. of Idaho*, 366 F.3d 813, 816-17 (9th Cir. 2004).  The inquiry is a fundamentally flexible one: "Evidence showing that all the *Bauman* factors are affirmatively presented by a case does not necessarily mandate the issuance of a writ, nor does a showing of less than all, indeed of only one, necessarily mandate denial; instead, the decision whether to issue the writ is within the discretion of the court."  *Id.* at 817 (citing *Kerr v. United States Dist. Ct.*, 426 U.S. 394, 403 (1976)).

In considering mandamus relief on behalf of Nordstrom, the Affected Attorneys appreciated that the standard is a high one.  But just as with the U.S. Supreme Court's *certiorari* practice, where thousands of ill-fated petitions are filed each year, the Affected Attorneys did not equate long odds with frivolousness, particularly in light of the issue of first impression that they raised.  Given that the standard is inherently discretionary, the Affected Attorneys did not believe that the Circuit's framework foreclosed an application for relief so long as they acknowledged and applied the appropriate standard (which they did).  The Petition filed by the Affected Attorneys cited the governing *Bauman* standard and applied its guidelines.

- 19 -

2.    The Petition Carefully Analyzed And Applied The Governing *Bauman* Elements.

A review of the Petition confirms that it accurately relied on the *Bauman* standard and explained how its guidelines were satisfied, both legally and factually.  The Panel's order further confirmed that *Bauman* is the controlling test.  As discussed below, the Affected Attorneys submitted what they believed to be substantial evidence with respect to each of the relevant *Baumann* factors, and did so in good faith.  Thus, the Affected Attorneys respectfully submit that they did not file the Petition in bad faith and that no sanctions are warranted.

a.    The Petition Explained Why Immediate Appellate Review Was Unavailable.

Before filing the Petition, Nordstrom exhausted all possible recourse before the district court.  After denial of summary judgment, it moved for reconsideration and for certification under 28 U.S.C. § 1292(b).   It was not until that motion was denied that the Petition was filed.

The Petition reflects these facts, explaining that Nordstrom had exhausted review at the district court and had no other means of securing immediate appellate relief.  (Pet. at 28).  It further cited this Court's decision in *Cole*, which denied mandamus relief when, among other things, the petitioner failed to seek reconsideration prior to bringing the petition.  (*Id.*).

In *Credit Suisse v. United States Dist. Ct. for the Central Dist. of Cal.*, 130 F.3d 1342 (9th Cir. 1997), this Court granted mandamus relief upon satisfaction of only three of the *Bauman* factors.  Importantly, on the first one, the Court recognized that there was no other adequate means of obtaining the desired relief even when the matter involved denial of a motion to dismiss.  *Id.* at 1345-46 (noting that the decision was not immediately reviewable and that the district court had denied a Section 1292(b) application: "The Banks thus have no other means of obtaining immediate review of the denial of their motion to dismiss.").  Just as in *Credit Suisse*, Nordstrom had no other means of obtaining immediate review from the denial of summary judgment.  (The Petition cited *Credit Suisse* at page 11.).

Similarly, other circuits have granted mandamus relief when confronted with the denial of summary judgment, albeit infrequently, but these decisions help validate the *Credit Suisse* approach.  *See, e.g.*, *McLee v. Chrysler Corp.*, 38 F.3d 67, 69 (2d Cir. 1994); *Mississippi Chem. Corp. v. Swift Agricultural Chem. Corp.*, 717 F.2d 1374, 1379 (Fed. Cir. 1983).

Accordingly, the Affected Attorneys advanced a good faith argument why the Petition satisfied the first *Bauman* factor, incorporating the lessons of this Circuit's prior cases by exhausting every available means of review at the district court level before filing the Petition.  The analysis advanced by the Petition further comports with this Circuit's decision in *Credit Suisse*.

b.    <u>The Petition Explained Why Nordstrom Would be Damaged in a Way Not Correctable on Appeal.</u>

The Affected Attorneys reasonably and in good faith believed that the harm caused by the district court's order would not be correctable on appeal. The Petition set forth a number of reasons why Nordstrom would be damaged irreparably, chief of which was the district court's suggestion that Nordstrom (and employers across California) would need to modify its compensation system. The district court observed that the result of its decision would "force[] Nordstrom and other employers throughout California to evaluate whether to continue to employ commission pay plans, which indisputably permit employees to earn compensation well in excess of minimum wage, for fear their pay plans may ultimately be deemed unlawful."  (Pet. at 28; *see also* Pet. at 5, 29-30).  Further, the district court's order would require Nordstrom to send notices to tens of thousands of employees.  Even if Nordstrom ultimately prevails at trial, the court would not be able to unwind the past.

The district court itself recognized that the natural consequence of its order would be to effect change in basic commission compensation systems.  It observed that the result of its decision would "force[] employers to craft hybrid compensation systems for commissioned or piece meal employees where they are also paying employees per hour for any activity that is not directly related to earning a commission. . . ."  (Pet. at 13-14 (quoting district court order)).  That is

- 22 -

one of the reasons that the Petition attracted broad *amicus* support: "If the trial court's decision is not reversed, numerous employers will be forced to terminate paying on a commission basis." (*Amicus* letter filed by Downtown LA Motors LP (ECF No. 2) at 3).

As the petition further noted, changing the compensation structure in response to the district court's order would accomplish more harm than good for both employers, employees and the consuming public. While potential liability down the road might be averted, "everyone involved in California's retail industry will feel the consequences." (Pet. at 15). As a result, at a minimum, the Affected Attorneys believed that they were presenting a good faith argument concerning the nature of harm faced by Nordstrom (and employers across the state). The fact that both the district court and the various *amici* acknowledged this harm further substantiates the good faith belief of the Affected Attorneys.

It is also important to appreciate part of the backdrop to the Petition. Litigation over certain related minimum wage issues has been brewing for some time, reaching the California Supreme Court, as illustrated by the *Peabody* and *Gonzalez* cases. These decisions have generated substantial uncertainty for employers, which explains why they have attracted so many *amicus* filings (sixteen were filed in support of a petition for review to the California Supreme Court in the *Gonzalez* case).

- 23 -

The Affected Attorneys stressed how "[i]mmediate review of the MSJ Order is necessary to protect the benefits that commission plans provide" and that "[p]rompt clarity will serve the important public purpose of providing certainty to employers and employees, and promoting maximum service for retail consumers." (Pet. at 15). As part of their argument, the Petition cited case law recognizing that mandamus petitions are appropriate in cases raising important public policy matters. *See Las Vegas v. Foley*, 747 F.2d 1294, 1296-97 (9th Cir. 1984) (granting writ of mandamus to provide guidance on controlling novel issue of law where case "presents an important issue of first impression" and resolution of the legal issue in question "would substantially aid the administration of justice"); *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1025 (9th Cir. 1982) (granting petition involving important public policy implications).

Notably, in *Peabody*, the Ninth Circuit similarly indicated, in its certification to the California Supreme Court, that the case was worthy of review because it presented a question for which there was no controlling precedent and because the question implicated significant policy concerns:

> Because of the complexity of these state law issues ***and because of their significant policy implications that will effect [sic] many employers and employees throughout California***, we believe that the Supreme Court of California, which has not yet interpreted the relevant provisions of the California Labor Code, is better qualified to answer the certified question in the first instance.

*Peabody*, 689 F.3d at 1137-38 (citation and internal quotation omitted, emphasis added). Further, this Court emphasized that commission plans are a key part of California's compensation structure. *Id.* Drawing upon this Court's language in *Peabody*, the Affected Attorneys formed a reasonable and good faith belief that the arguments they were advancing were well-founded and that the exercise of this Court's supervisory mandamus authority would be appropriate under such circumstances. (Pet. at 12-14); *see also In re Cement Antitrust Litig.*, 673 F.2d at 1025 ("It is for just such an exceptional circumstance that the writ was designed. Plaintiffs have done so here and that petition will be reviewed on the merits."). The Petition sought to expedite, rather than delay, the conclusion of the litigation and potentially avert substantial costs to the resources of the courts and the parties.

c.   The Petition Explained Why Multiple Clear Errors of Law Existed.

Recent authority from this Circuit has emphasized the paramount importance of the "clear error" prong of *Bauman*, describing it as "dispositive." *Islamic Shura Council of S. Cal. v. FBI*, 635 F.3d 1160, 1165 (9th Cir. 2011). Understanding that significance, the Affected Attorneys devoted the bulk of the Petition's analysis to the "clearly erroneous" argument. (Pet. at 16-28).

Issues that involve a controlling question of law are ripe for mandamus review. *See Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1338-40 (9th

Cir. 1976) (district court's order certifying class was improper due to legal error justifying correction through grant of writ of mandamus). The Petition noted that the district court's summary judgment order involved controlling questions of law, and the district court confirmed this when it stated: "Here, the summary judgment is a question of controlling law: does *Armenta's* prohibition on wage averaging apply to commissioned employees who are not being separately compensated for time during which they are unable (or at least highly unlikely) to earn a commission." (AP 26:8-11). As discussed at length in the Petition, the district court committed a number of clear errors in addressing the controlling question of law.

The Petition walked through the district court's first clear error of law by explaining the various regulatory guidance from the California Division of Labor Standards and how that guidance sharply conflicts with the district court's order. (Pet. at 17-18). The Petition set forth extensive arguments demonstrating that the district court had disregarded California authorities recognizing that employers may satisfy their minimum wage obligations with draw commission plans where the guaranteed draw equals or exceeds minimum wage. The Petition further demonstrated that the district court clearly erred in relying entirely on *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 315 (2005), and its progeny, to conclude for the first time ever that an employer such as Nordstrom could pay commissions only for

work during which the plaintiffs completed a threshold (but unspecified) number of sales.  As the Petition argued, *Armenta* and the cases relied upon by the district court did not involve a guaranteed minimum draw (or even commission pay plans). Rather, those cases were limited to situations where employees allegedly received no compensation for particular time periods.  (Pet. at 20).  Accordingly, Nordstrom's case was distinguishable from *Armenta*, rendering those cases inapposite.  Importantly, the difference between the Nordstrom case and *Armenta* was confirmed by the California Court of Appeals in *Gonzalez* when it explicitly held that its decision regarding piece rate compensation should not apply to commission pay plans.  *Gonzalez*, 215 Cal. App. 4th at 54. Again, Nordstrom's draw commission plan is different from the pay plans at issue in *Armenta*, *Peabody* and *Gonzalez* because the hourly guaranteed draw applies to each hour worked.  It applies if employees make $0 in sales and is never averaged across all hours worked.

To bolster the clear error argument, the Petition highlighted various instances where the district court itself appeared to express misgivings about its result and/or lent support to Nordstrom's position, including how the district court described the ruling in *Armenta* as achieving a "peculiar result" and expressed its "misgivings about the *Armenta* decision."  (Pet. at 3-4, quoting AP 9:20-24, n.7, 25:14-16).

Although the district court ultimately concluded that it was compelled to follow a handful of district court decisions regarding piece rate compensation plans to support its decision, the Affected Attorneys were justified in believing in good faith that this result produced a clear error in light of regulatory guidance and the limited holding of *Armenta*. *See Fitz-Gerald v. SkyWest, Inc.*, 155 Cal. App. 4th 411, 417 (2007) (holding in *Armenta* applies where agreed-upon wages are not paid). Indeed, after the decision was rendered, the California Court of Appeals in *Gonzalez* explained that its decision regarding piece rate compensation specifically did not apply to commission plans, such as the plan at issue in the Petition. *See Gonzalez,* 215 Cal. App. 4th at 54 ("The instant case concerns only automotive service technicians compensated on a piece-rate basis. We do not address or consider employees who are compensated under commission payment plans or any other incentive-based compensation systems.").

The Petition further set forth a highly detailed analysis demonstrating how the district court clearly erred for a second time, in finding that Nordstrom may not pay commissions for stocking, marketing, pre-opening, and post-closing selling time. (Pet. at 21-28). The Petition explained that this part of the district court's holding contained three additional clear errors of law

First, the Petition argued that neither California's minimum wage statute nor the applicable California Labor Code or Industrial Welfare Commission Wage

Order state that commission compensation may be paid only for time spent on sales work. (Pet. at 22-25). Specifically, the Petition explained that the district court's opinion conflicts with the Labor Code and the Wage Order, in that both authorities unequivocally state employers may pay commissions for any labor performed. The Petition further stated that the district court acknowledged these authorities, yet erroneously limited commission compensation to time spent on sales work, when no such limitation exists under the relevant statutes and regulation. The Petition also cited to the *Peabody* case, the DLSE Manual, DLSE Opinion Letters, and other federal statutes and regulations in support of its position. (Pet. at 24-25).

Second, the Petition demonstrates that the district court compounded this error by holding that the tasks that Plaintiffs performed during pre-opening and post-closing selling time and performing "stock assignments" and "marketing duties" in this case did not constitute "sales work." (Pet. at 25-26). The Petition explains, however, that a number of California cases support a finding that, as a matter of law, the pre-opening and post-closing activities were "sales work." (Pet. at 26).

Third, the Petition outlined how the district court clearly erred by holding that California law indicates an employee must complete a threshold number of sales per hour for that time to be compensable with commissions. (Pet. at 26-28).

The Petition sets forth that the district court made this finding, but cited no authority for the proposition. (Pet. at 27). Indeed, there is no California authority that would support the district court's finding that commissions may be paid only for work periods in which an employee records an undefined threshold number of sales.

The "clear error" analysis under *Bauman* is not susceptible to mathematical precision, but is rather a question of degree: "How clear is it that the lower court's order is wrong as a matter of law?" *Bauman*, 557 F.2d at 655. Given that the question posed a question of degree, the Affected Attorneys believed that they had reasonably asserted a "clear error" in the Petition on behalf of Nordstrom.

>  d.  <u>The Petition Explained that it Raised a Novel Issue of First Impression.</u>

The Affected Attorneys also believed in good faith that they were advancing a novel issue of first impression. Since 2005, there had been a string of decisions regarding how employers may satisfy minimum wage obligations in California. The district court's summary judgment decision in this case was the first time that this line of cases had been extended to commission compensation plans. It was the first time that a court had ever called into question the validity of draw commission plans, particularly one that had guaranteed a minimum draw in excess of minimum wage. Accordingly, the Affected Attorneys had a reasonable basis for believing that the Petition raised a novel point of law worthy of mandamus consideration.

Several facts in the record supported the Affected Attorneys' good faith belief that the fourth *Bauman* factor could be satisfied, including:

- The district court noted it was an issue of first impression.

- In certifying the dispute at issue in *Peabody* to the California Supreme Court, this Court noted that no court had addressed how commission may be used to satisfy minimum wage.

- No California decision holds that a draw commission system akin to Nordstrom's plan is unlawful.

- No Ninth Circuit decision holds that a draw commission system is unlawful.

- Provisions in the Enforcement Policies and Interpretations Manual issued by the DLSE provide support for the position that commission plans like Nordstrom's are lawful.

- The district court relied on authority that did not involve draw commission plans.

- After the district court issued its ruling, the California Court of Appeal in *Gonzalez* specifically stated that the rationale it applied to piece rate compensation plans should not be read to apply to commission plans.

The Affected Attorneys' good faith belief that they were advancing an issue of first impression was confirmed by the numerous *amici* parties who filed papers in support of the Petition.  One of the basic points that echoes through the *amicus* filings is that neither this Court nor the California Supreme Court has ever ruled on the question presented.  .  *See Amicus* letter filed by California New Car Dealer's Assn. (ECF No. 3), at 1 (emphasizing that California courts have not yet "issue[d]

an opinion on the subject matter of this writ petition"); *Amicus* letter filed by Downtown LA Motors LP (ECF No. 2), at 1 (describing the case as "a case of first impression"); Amicus letter of National Retail Federation (ECF No. 4), at 2 (arguing that retailers "need to know as soon as possible what the law requires in connection with this issue of first impression").

Ultimately, the Affected Attorneys were aware, based on this Court's *Peabody* decision, that commission plans are a key part of California's employment compensation structure. *See Peabody*, 689 F.3d at 1137-38. And, indeed, the issues are so important that this Court certified a related commission compensation question to the California Supreme Court. *Id.* at 1135. This added further support to the Affected Attorneys' good faith belief that they were raising an important issue of law as a matter of first impression.

Given the Affected Attorneys' good faith belief that they raised issues of first impression in the Petition, the Affected Attorneys respectfully submit that sanctions are not warranted. *See Estiverne v. Sak's Fifth Ave.*, 9 F.3d 1171, 1174 (5th Cir. 1993) (rejecting sanctions against party for a frivolous appeal: "Sanctions are inappropriate if the issue is one of first impression. Because the issue regarding the [legal issue] was novel to this Court, we decline to impose sanctions on appeal."); *Freeman v. Local Union No. 135 Chauffeurs, Teamsters*, 746 F.2d 1316, 1322 n.13 (7th Cir. 1984) (finding no basis to impose sanctions where the

case presented an issue not previously decided by the Court of Appeals, appellant's position on the issue was not unreasonable, and there was no evidence of bad faith on the part of appellant's attorney).

e. The Final <em>Bauman</em> Factor.

Finally, the Petition did not directly analyze the final *Bauman* factor concerning "oft-repeated error[s]," *Bauman*, 557 F.3d at 655, because this factor has no applicability in this case. This Court has noted that few cases will arise "where each guideline is even relevant or applicable." *Credit Suisse*, 130 F.3d at 1345; *see also Admiral Ins. Co. v. U.S. Dist. Court*, 881 F.2d 1486, 1491 (9th Cir. 1989) ("The fourth and fifth *Bauman* factors are rarely, if ever, present at the same time.").

3. The Broad <em>Amicus</em> Support For The Petition Further Confirms Good Faith.

The fact that the Petition attracted broad *amici* support is further evidence that the Affected Attorneys filed it in good faith. As noted above, numerous *amici* parties filed papers to ensure that the Court appreciated the significance of this case, highlighting that the question before the Court was one of first impression. These *amici* parties included various business groups represented by sophisticated counsel – parties and counsel who would not have lent support to a frivolous mandamus petition. To the contrary, their efforts supported the Petition's analysis concerning the question of first impression presented, the clarity of the error, and

- 33 -

the overarching importance of these issues.  In effect, the positions articulated by the *amici* supported the Affected Attorneys' good faith belief that they were advancing reasonable arguments in the Petition.

The Affected Attorneys accordingly respectfully ask the Appellate Commissioner to consider the *amici* letters filed in support of the Petition as further evidence that the Petition was filed in good faith.

>4. <u>Counsel Sought Advice From The Co-Chair Of Their Firm's Appellate Group Before Filing The Petition.</u>

Additional evidence of good faith is set forth in Julie Dunne's Declaration. Before filing, Ms. Dunne contacted the co-chair of her firm's Appellate Practice Group to obtain his independent input regarding the propriety of filing a petition under the facts in this case.  *See* Dunne Decl. ¶ 19.  In addition, Ms. Dunne reviewed the basis for the writ with the co-chair to obtain his review of the Petition itself.  *Id.*

The Petition was not filed haphazardly or reflexively.  Rather, consistent with the experience and professional character of the Affected Attorneys, they carefully considered the issues in advance of filing.  Ms. Dunne's decision to seek further independent advice from an experienced appellate attorney at her law firm, separate from the team of attorneys who had been working on the case, regarding the filing of the Petition is yet additional evidence that supports the Affected Attorneys' good faith in filing it.

- 34 -

5.    Counsel Are Widely Respected Attorneys Who Never Have Been Sanctioned Previously.

As a further testament to their good faith in filing the Petition, the Affected Attorneys respectfully ask the Appellate Commissioner to consider their professional records and the lack of previous sanctions imposed against them.

As described more fully in the facts section and in their declarations, the Affected Attorneys have collectively 40 years of exemplary practice. They have never been sanctioned by any court, and have contributed significantly to their bar associations and communities. The Appellate Commissioner should consider their backgrounds and careers in his analysis.

Recognizing that "[m]andamus is reserved for extraordinary circumstances," *Seedman v. United States Dist. Ct.*, 837 F.2d 413, 414 (9th Cir. 1988), in their careers, Ms. Dunne and Ms. Strauss have collectively filed one mandamus petition in the Ninth Circuit prior to the instant one, and Mr. Levine has not filed any. *See* Dunne Decl. ¶ 9; Strauss Decl. ¶ 5; Levine Decl. ¶ 6. While the Court denied the mandamus petition that was filed previously by Ms. Dunne and Ms. Strauss, the Court did not suggest in its order that the petition was frivolous, nor did it caution Ms. Dunne or Ms. Strauss in any way. In fact, that petition further supports the Affected Attorneys' good faith, because (like the instant Petition), it discussed and applied *Bauman* and the requisite guidelines. (Dunne Decl. Ex. B).

- 35 -

Finally, as described below, in most instances courts provide warnings prior to the imposition of any sanctions. The Affected Attorneys have not received any such prior admonition.

### C. This Circuit Has Never, in any Published Order, Previously Declared a Mandamus Petition Frivolous and Issued an Order to Show Cause Why Monetary Sanctions Should Not Be Imposed.

In considering whether sanctions should be imposed in this case, it is notable to point out that that this Circuit has **never**, in a published order, declared a mandamus petition frivolous and issued a show cause order for monetary sanctions. In fact, largely owing to the discretionary nature of mandamus relief, it is difficult to find any comparable orders from other circuits. Certainly, one can imagine extreme examples, such as where a *pro se* litigant refuses to accept defeat and launches an attack on the federal judiciary. *See, e.g., In re Vincent*, 105 F.3d 943, 944-45 (4th Cir. 1997) ("In his recent *mandamus* petition, Vincent made several requests which have been repeatedly rejected by this court. . . . In lieu of particularized fees and costs, we order Vincent to pay sanctions in the amount of $500, as we have frequently done in analogous circumstances."). In fact, that situation is the closest this Court has ever come to imposing sanctions for a frivolous mandamus petition. Even when faced with a *pro se* litigant who had filed 24 petitions that the Court deemed "abusive," the Court only restricted further

filings unless the filing fee was paid but did not take more serious action. *Demos*, 925 F.2d at 1161-62.

The Affected Attorneys respectfully submit that the Petition bears no resemblance to such frivolity. *See, e.g.*, *Liberty Mutual Ins. Co. v. Ward Trucking*, 48 F.3d 742, 751 (3d Cir. 1995) (refusing to impose sanctions based on mandamus petition when "Liberty Mutual raised a novel question in its petition regarding the parameters of [the statutory provisions at issue], and presented a meritorious argument in favor of reviewability.").[5] The Affected Attorneys' actions in this case stand in stark contrast to these abuses of the judiciary that courts have held to warrant sanctions. *See Chambers,* 501 U.S. at 56-57 ("[F]ull attorney's fees were warranted due to the frequency and severity of Chambers' abuses of the judicial system and the resulting need to ensure that such abuses were not repeated. . . . Chambers' actions were part of [a] sordid scheme of deliberate misuse of the judicial process . . . .") (internal quotations omitted).

---

[5] Courts also appreciate, even outside the inherent authority context, that the filing of a frivolous appeal does not automatically call for sanctions. *See, e.g., CytoLogix Corp. v. Ventana Med. Sys*., 513 F.3d 271, 273 (1st Cir. 2008) ("[W]e do not find Cytologix's position to be so frivolous as to warrant sanctions."); *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 753 (8th Cir. 1986) ("We do not go so far . . . to conclude that Schlitz' appeal was so frivolous as to support an award of attorney fees . . . ."); *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 539 (7th Cir. 2007) ("There is no evidence . . . that Guardsmark continued to litigate in bad faith, and we think this case is too close to the line to warrant sanctions.").

Moreover, even in cases where parties have exhibited an "outrageous history of frivolous and vexatious litigation" (which stands in stark contrast to the facts here), courts have issued warnings before ordering sanctions. *See, e.g., Chambers*, 501 U.S. at 56 ("Chambers received repeated timely warnings both from NASCO and the court that his conduct was sanctionable."); *Deutsch v. Tippy*, 1996 U.S. App. LEXIS 2501, at *3 (2d Cir. Jan. 16, 1996) ("[G]iven Deutsch's outrageous history of frivolous and vexatious litigation (between mandamus petitions and notices of appeal, he has sought appellate review of district court orders and decisions at least 45 times in this Circuit), the time has come for a warning. Should Deutsch file another frivolous appeal, mandamus petition, or motion with this Court, we will impose appropriate sanctions . . . ."); *Mercer v. Fayette Circuit Court*, 1995 U.S. App. LEXIS 9051, at *4-5 (6th Cir. Apr. 13, 1995) ("Mercer filed a total of nine lawsuits in the district court, all of which were dismissed as frivolous.  She filed an appeal of all of those cases in this court.  Should Mercer continue to file frivolous appeals in the future, the court may impose sanctions against her.").

The situation in this case – where a mandamus petition was filed that cited the correct standard and articulated reasoned arguments based on the applicable guidelines – pales in comparison to the extant case law concerning attorney

sanctions.  For all of the foregoing reasons, therefore, the Affected Attorneys respectfully request that monetary sanctions not be imposed against them.[6]

## III.  Monetary Sanctions Are Not Appropriate In This Case, Under This Court's Inherent Authority.

### A.    Monetary Sanctions Would Serve No Compensatory or Deterrent Purpose.

In addition to the reasons described above, monetary sanctions are not appropriate in this case because they would serve no compensatory or deterrent purpose.  As the Supreme Court recognized in *Chambers*, sanctions levied pursuant to a court's inherent power must be proportionate to the claimed harm. *See Chambers*, 501 U.S. at 46.  Thus, a court's sanctioning power should not be invoked unless the sanction is "tailored to fit the particular wrong."  *Topalian v. Ehrman*, 3 F.3d 931, 936 (5th Cir. 1993); *Klein v. Stahl GMBH & Co. v. Maschinefabrik*, 185 F.3d 98, 108 (3d Cir. 1999) ("court should consider invoking

---

[6] While the Affected Attorneys respectfully maintain that no sanctions are warranted at all, they also point out that additional mitigating factors should be considered for Mr. Levine, who was the junior attorney on the case.  *See, e.g., United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1109 n.6 (9th Cir. 2001) (noting that the district court judge "chose not to sanction the junior associate on the case, based on his colleagues' representations that he worked solely in a research capacity, and lacked decision-making responsibilities."); *Blue v. U.S. Dep't of Army*, 914 F.2d 525, 546 (4th Cir. 1990) (reversing imposition of sanctions against associate of law firm where associate was following directions of a senior partner in charge of case; court was "unwilling to see the career of a young attorney compromised at its inception").

its inherent sanctioning power only . . . when the sanction is tailored to address the harm identified").

Here, there is no compensatory purpose in imposing sanctions on the Affected Attorneys because the underlying plaintiffs never had to, and did not, file a response to the Petition. Courts generally require a causal connection between the wrongful conduct and the damage actually incurred. *See Chambers*, 501 U.S. at 46 (sanctions should be used to "mak[e] the prevailing party whole for expenses caused by his opponent's obstinacy"); *Miller v. City of L.A.*, 661 F.3d 1024, 1029 (9th Cir. 2011) ("the amount awarded had to compensate the Millers for the damage actually caused . . .").

In addition to having no compensatory purpose, monetary sanctions in this case would not serve any deterrent purpose. The Affected Attorneys recognize and fully appreciate that mandamus relief is an extraordinary remedy that should be sought only infrequently. For this reason, the Affected Attorneys have only ever previously filed a collective total of one mandamus petition in this Circuit. *See* Dunne Decl. ¶ 9, Strauss Decl. ¶ 5; Levine Decl. ¶ 6. Accordingly, there is no prior abuse of the mandamus practice, and there is no danger that the Affected Attorneys will abuse mandamus relief and flood this Court with mandamus petitions in the future.

Moreover, and importantly, given that attorneys' fees and costs are not at issue here, there are simply no benchmarks for measuring appropriate sanctions of a punitive nature to deter frivolous filings. As the Supreme Court recognized in *Chambers*, a primary aspect of a court's discretion under its inherent powers "is the ability to fashion an appropriate sanction." *Chambers*, 501 U.S. at 44.

### B.    Monetary Sanctions Would Chill Legitimate Advocacy.

Moreover, there is real danger that an award of sanctions here would chill legitimate and diligent advocacy by attorneys on behalf of their clients. *See, e.g., Primus,* 115 F.3d at 649 (noting the concern, in the inherent authority context, of not discouraging "meritorious arguments"). The circuits have recognized that the invocation of a court's sanctioning power under its inherent authority is the exception, not the rule. *See Conner v. Travis County*, 209 F.3d 794, 799 (5th Cir. 2000) ("A court may use its inherent powers to sanction an attorney who acts in bad faith. Invocation of [the] sanctioning power is the exception rather than the rule.") (citations omitted); *Kipps v. Caillier*, 197 F.3d 765, 770 (5th Cir. 1999) (recognizing that "the threshold for the imposition of [inherent authority] sanctions is high").

Indeed, this Court explained long ago in *Grimes v. Commissioner*, 806 F.2d 1451 (9th Cir. 1986), that it should be "sensitive to the obligations of the courts to provide access for petitioners seeking in good faith to avail themselves of the

protection of the law, and we do not impose sanctions lightly." *Id.* at 1454 (awarding sanctions only after the Court assured itself that the appellant's arguments lacked "any semblance of merit" because they were "contrary to specific and unambiguous statutory provisions and to clearly established principle of law"); *Primus*, 115 F.3d at 650 ("Sanctions not only may have a severe effect on the individual attorney sanctioned but also may deter future parties from pursuing colorable claims. Because . . . inherent powers are so potent, we require courts levying sanctions to assess an attorney's individual conduct and to make an explicit finding that he or she acted in bad faith."); *Zarowitz v. BankAmerica Corp.*, 866 F.2d 1164, 1166 (9th Cir. 1989) ("Too exuberant use of sanctions could chill some meritorious appeals. We therefore hesitate to exercise our discretion by imposing a sanction in this case, even though the appeal borders on the frivolous."). This is particularly true where (as here) federal rights are involved. *See* 28 U.S.C. §1651(a) (codifying right to issue writ of mandamus).

Accordingly, the Court should not effectively remove the potential remedy of mandamus by raising the specter of monetary sanctions in light of this record. But with the published order in this matter, that is a legitimate risk – especially in

considering the good faith conduct of counsel and the *amici* groups supporting their position, as chronicled above.[7]

## CONCLUSION

For all of the foregoing reasons, the Affected Attorneys respectfully request that the Order to Show Cause be discharged and that no sanctions be imposed.[8]

Dated: July 18, 2013                    Respectfully submitted,

                                        /s/ Mark C. Dosker
Pierre  H. Bergeron                     Mark C. Dosker
Squire Sanders (US) LLP                 Squire Sanders (US) LLP
221 E. Fourth Street, Suite 2900        275 Battery Street, Suite 2600
Cincinnati, Ohio 45202                  San Francisco, California 94111
Telephone:  (513) 361-1200              Telephone:  (415) 954-0200
Fax:  (513) 361-1201                    Fax: (415) 393-9887
pierre.bergeron@squiresanders.com       mark.dosker@squiresanders.com

                                        *Attorneys for  Julie A. Dunne, Lara K.*
                                        *Strauss, and Joshua D. Levine*

---

[7] Additionally, the Affected Attorneys respectfully submit that the Appellate Commissioner lacks authority under existing Ninth Circuit rules to impose sanctions.  The Panel cited both Circuit Rule 46-2 and General Order 12.9(a), but neither authority permits the Commissioner to impose an award of sanctions in the first instance.  The Affected Attorneys respectfully submit that the Appellate Commissioner, however, does have the authority to discharge the Order to Show Cause and to deny sanctions, and that he should do so in this circumstance.

[8] At this time, the Affected Attorneys do not request a hearing in connection with their response to the Show Cause Order.  If the Appellate Commissioner has specific concerns, or otherwise deems it necessary, however, the Affected Attorneys would appreciate the opportunity to participate in a hearing to address any such matters.

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 18, 2013.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


/s/ Pierre H. Bergeron
Pierre H. Bergeron